[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16400

_____

D.C. Docket No. 1:15-cr-20579-JAL-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROLANDO MULET,
ODALYS MARRERO,
a.k.a. Tita,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 27, 2018)

Before MARCUS, FAY, and HULL, Circuit Judges.

PER CURIAM:

Rolando Mulet and Odalys Marrero appeal their convictions for conspiracy to defraud the United States, 18 U.S.C. § 371, and unlawfully encouraging an alien to reside in the United States, 8 U.S.C. § 1324(a)(1)(A)(iv).  Mulet also appeals his total sentence.  Both defendants argue that the district court deprived them of their constitutional right to present a defense by excluding evidence that they had little financial incentive to commit immigration fraud.  Mulet further asserts that his right to remain silent was violated when the government elicited testimony that he had said he "had nothing to say."  Mulet also contends that the district court erred by imposing a three-level enhancement under the Sentencing Guidelines and that his total sentence is substantively unreasonable.  We conclude that the district court did not abuse its discretion by excluding evidence of Marrero and Mulet's legitimate business activities and that Mulet's argument regarding the comment on his right to remain silent is foreclosed by binding precedent.  Even if the district court erred in assessing a three-level Guidelines enhancement, such error does not warrant reversal because his total sentence was reasonable.  Accordingly, we affirm.

## I. BACKGROUND

From 1999 until 2015, Marrero and Mulet owned and operated Tita's Tramite & Travel (Tita's), a Florida business that provided immigration services.  In 2015, a grand jury returned an indictment charging Marrero and Mulet with

2

conspiracy to defraud the United States (Count 1) and unlawfully encouraging an alien to reside in the United States (Counts 7 through 12).[1]  Specifically, the indictment alleged that Marrero and Mulet arranged fraudulent marriages between Cuban citizens and non-Cuban aliens in order to qualify the non-Cuban aliens for immigration benefits, including lawful permanent residency.[2]

Prior to trial, the government filed a motion in limine to exclude, in relevant part, evidence of the defendants' legitimate business activities.  In response to the government's motion in limine, Marrero stated that she was "prepared to present evidence that Tita's Tramite & Travel was by and large a legitimate business" that "offered a wide variety of immigration services besides . . . marriage-based petitions," including "applications for employment authorization, applications for travel, applications to bring alien relatives to the United States, and naturalization applications."  The district court granted the motion in part, finding that evidence of Marrero and Mulet's legitimate business activities was not admissible to negate the elements of the charged offenses.

At trial, the government presented the following evidence.  Manuel Andres Gomez, Okyvi Olmar Yoll Mesa, and Natacha Perera Quintana—Venezuelan

---

[1] Several codefendants were also charged with conspiracy to defraud the United States and marriage fraud, 8 U.S.C. § 1325(c).

[2] Under the Cuban Adjustment Act of 1966, Pub. L. No. 89-732, 80 Stat. 1161, a Cuban citizen may adjust his status to lawful permanent resident after living in the United States for a year and one day.  The spouse of a lawful permanent resident Cuban may also adjust his status to lawful permanent resident.  *Id.*

3

citizens who wanted to become lawful permanent residents—were told to contact Marrero and Mulet to "fix" their immigration statuses.  Each of the aliens met with Marrero and Mulet at Tita's.  Marrero told the aliens that she had been in business for a long time and that she "knew the tricks of the trade," "had people in Immigration," and had a lot of experience "getting [immigration] papers."  She explained that the aliens could marry Cubans and that doing so would allow them to obtain "green cards"—cards given to lawful permanent residents.  Marrero's price for arranging such a marriage ranged from $16,000 to $21,000.[3]  Marrero also specified that all payments had to be in cash, and everything was to be discussed either in person with her or Mulet, or over the phone using code words.

Once the aliens made initial payments, Marrero introduced them to their future spouses, three Cuban citizens, whom the defendants procured and paid.  The aliens subsequently "married" the Cubans, and Mulet notarized the marriage certificates.[4]  Each couple had a wedding ceremony and reception, during which pictures were taken.  In accordance with Marrero's instructions, the couples also took pictures in other places to make their marriages appear to be real.  None of the marriages were legitimate.

---

[3] Yoll paid the defendants $16,000, Perera paid between $18,000 and $20,000, and Gomez paid $21,000.

[4] No party to these sham marriages had any intention of having a real ceremony.

4

With Mulet's help, the aliens completed applications for permanent residency. To prepare for the immigration interviews, Marrero or Mulet gave the aliens and their Cuban spouses questionnaires to study. The questionnaires, which were 100 or more items long, listed questions that were frequently asked at immigration interviews, such as biographical information about each spouse. Gomez and his new wife also met with Marrero and Mulet two or three times to do mock interviews. Ultimately, only Perera obtained a green card; Gomez's and Yoll's applications were denied.

Gomez subsequently met with Special Agent Mildred Laboy, a criminal investigator for the United States Department of Homeland Security. Gomez "[came] clean" to Laboy and told her that Tita's was arranging marriages between Cubans and non-Cubans so the non-Cubans could obtain green cards. At Laboy's request, Gomez went to Tita's three times with a recording device and recorded conversations between himself, Marrero, and Mulet. During the first recorded conversation, Marrero offered to "fix [Gomez's] situation" in return for another $25,000. Gomez returned to Tita's twice more, attempting to have Marrero refund part of the money he had already paid. At the last meeting, Marrero was "very angry" and upset because Gomez had spoken to an attorney about his situation. According to Gomez, Marrero did not want others to know that he had made "this sort of a deal" with her.

5

Once Gomez completed the first recording, Laboy applied for and executed a search warrant for Tita's. After Laboy began searching the business, Marrero and Mulet arrived. Laboy provided them with a copy of the search warrant and told them about the allegations against them. Laboy testified that Marrero denied the allegations. The prosecutor then asked, "And as for Mr. Mulet, what did he say to you?" Laboy responded, "[H]e said he had nothing to say about that." Mulet objected and moved for a mistrial; the district court denied the motion.

After the government rested,[5] the defense called two character witnesses, who testified that the defendants were honest. Marrero also called Carmen Cabrera, who testified that she had met Marrero when her Cuban husband took her to Tita's to "try to legalize [her] situation and . . . to get married." Shortly thereafter, the government objected to Cabrera's testimony. During a sidebar conference, the defense proffered that Cabrera would testify that she had been Marrero's client, that she had returned to Marrero after she had a difficult time during her immigration interviews, and that she had communicated her experience to Marrero. Relying on its prior ruling on the government's motion in limine, the district court sustained the government's objection and stated that Cabrera could not testify as to particular services Marrero provided during the period of the

---

[5] At the conclusion of the government's case, the district court entered a judgment of acquittal as to Counts 8 and 11.

6

alleged conspiracy.  Following deliberations, the jury convicted Marrero and Mulet of Counts 1, 7, 9, 10, and 12.

At sentencing, Marrero and Mulet objected to the assessment of a three-level enhancement based on the number of aliens smuggled, transported, or harbored, pursuant to U.S.S.G. § 2L1.1(b)(2)(A).[6]  The district court overruled Marrero's and Mulet's objections.  The defendants' resulting Guidelines ranges were 30 to 37 months' imprisonment.  For both defendants, the district court imposed a 37-month sentence as to Count 1 and 48-month sentences as to Counts 7, 9, 10, and 12, all to run concurrently.  The court noted that it would have imposed the same sentences even if its Guidelines calculations were erroneous.

## II. DISCUSSION

### A. Exclusion of Evidence

We review district courts' decisions as to the admission of evidence for abuse of discretion, but we review constitutional challenges de novo.  *United States v. Rushin*, 844 F.3d 933, 941 (11th Cir. 2016).  "[A] defendant's [constitutional] right to a fair trial is violated when the evidence excluded is

---

[6] Section 2L1.1(b)(2)(A) of the Sentencing Guidelines provides for a three-level enhancement if the offense involved the smuggling, transportation, or harboring of between 6 and 24 aliens.  U.S.S.G. § 2L1.1(b)(2)(A).  Aside from the evidence discussed above, the government presented evidence at trial that the defendants arranged a fourth sham marriage between a Cuban and an alien.  At sentencing, Laboy testified regarding two more sham marriages that the defendants arranged.  The district court credited Laboy's testimony and found that the offense involved the smuggling, transportation, or harboring of between 6 and 24 aliens.

material in the sense of a crucial, critical, highly significant factor." *Id.* (quotation omitted).

The district court did not abuse its discretion by excluding Cabrera's testimony.[7] The government did not contend at trial that Tita's was an entirely illegitimate business, so this evidence was unnecessary to rebut the government's arguments. Moreover, the government's evidence of guilt was overwhelming. At trial, three aliens testified that Marrero and Mulet charged them large sums of money to arrange illegitimate marriages with people they had never met. Marrero instructed the aliens to discuss the marriage arrangements only in person or over the phone using code words and commented several times that the purpose of the marriages was for the aliens to obtain green cards, which strongly suggests that she knew the marriages were illegitimate and intended to engage in a scheme to

---

[7] We do not review whether the district court abused its discretion by excluding other evidence of the defendants' legitimate business activities because the defendants failed to make a sufficient proffer regarding this evidence. The preferred way to make a proffer is to file an affidavit or deposition, or to call the witness to present testimony outside the presence of the jury. However, counsel's statements, standing alone, may form an adequate basis for a proffer provided that they outline a witness's anticipated testimony in sufficient detail. *See United States v. Stephens*, 365 F.3d 967, 973-974 (11th Cir. 2004) (concluding that the record was sufficiently developed to review a claim that evidence was improperly excluded when counsel explained in detail the anticipated contents of three witnesses' testimony). Here, Marrero explained in sufficient detail the anticipated contents of Cabrera's testimony to allow us to review the defendants' claim that the district court abused its discretion by excluding her testimony. By contrast, we can only guess as to what other evidence the defense would have offered to show that Tita's provided legitimate immigration services, given that Marrero only outlined the general topics about which she was prepared to present evidence. Because the defendants failed to make a sufficient proffer with respect to any other evidence they would have offered regarding their legitimate business activities, we have nothing to decide with respect to that issue. *See Busby v. City of Orlando*, 931 F.2d 764, 786 (11th Cir. 1991) ("Because we have no proffered testimony before us to review, we have nothing to decide with respect to [the issue of whether the district court abused its discretion by excluding a witness's testimony].").

defraud the United States by arranging such marriages. Mulet, who was present for Marrero's conversations with the aliens, notarized the marriage certificates and helped fill out the aliens' applications for permanent residency. At most, Cabrera's testimony might have suggested that they had little financial incentive to commit immigration crimes. Such evidence was not crucial to their defense, as it did not counter any of the government's extensive evidence of guilt. Accordingly, we conclude that it was not an abuse of discretion to exclude Cabrera's testimony.

### B. Denial of Mulet's Motion for a Mistrial

"We review the district court's denial of a motion for a mistrial for abuse of discretion." *United States v. Abraham*, 386 F.3d 1033, 1036 (11th Cir. 2004). Here, the district court did not err, much less abuse its discretion, by denying Mulet's motion. When Mulet told Laboy that he "had nothing to say about that," he had not been arrested or given his *Miranda*[8] warnings. We have previously stated that the government may comment on a defendant's silence under these circumstances. *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991). Even if *Rivera* was wrongly decided, which we do not think is the case, we have no authority to overrule it. *Hazewood v. Found. Fin. Grp., LLC*, 551 F.3d 1223, 1227 (11th Cir. 2008) ("[T]he holding of a three-judge panel is the law of the

---

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

9

circuit unless it is overruled (or undermined to the point of abrogation) by the en banc Eleventh Circuit, or by the Supreme Court of the United States.").

### C. Reasonableness of Mulet's Total Sentence

We review the reasonableness of a defendant's sentence under a deferential abuse-of-discretion standard. *United States v. Livesay*, 525 F.3d 1081, 1090 (11th Cir. 2008). When a district court errs in calculating a defendant's Guidelines range, but states that it would have imposed the same sentence regardless of any Guidelines calculation errors, we will uphold the defendant's sentence so long as it is reasonable. *See United States v. Keene*, 470 F.3d 1347, 1348-50 (11th Cir. 2006).

Assuming arguendo that the district court erred in assessing a three-level enhancement under U.S.S.G. § 2L1.1(b)(2)(A), such error does not warrant reversal of Mulet's sentences. If the district court had decided the enhancement issue in Mulet's favor, his Guidelines range would have been 21 to 27 months' imprisonment.[9] Even using this lower Guidelines range, Mulet's 48-month total sentence was reasonable in light of the facts of the case. As discussed above, the government presented overwhelming evidence that Marrero and Mulet charged

---

[9] Under the district court's calculations, Mulet had a total offense level of 19 and a criminal history category of I, which yielded a Guidelines range of 30 to 37 months' imprisonment. Without the three-level enhancement, Mulet would have had a total offense level of 16 and a criminal history category of I, resulting in a Guidelines range of 21 to 27 months' imprisonment. The district court could have imposed much higher sentences as to Counts 7, 9, 10, and 12, and made these sentences run consecutively. At sentencing, the district court made clear that it would have imposed the same sentence absent the enhancement.

aliens thousands of dollars each to arrange sham marriages for the purpose of defrauding the United States. They facilitated every step of the immigration process, from procuring Cubans to act as spouses for the aliens, to introducing the aliens to their Cuban spouses, to notarizing the aliens' marriage certificates, to filling out the residency applications, to preparing the aliens for immigration interviews. Under these circumstances, Mulet's 48-month total sentence was not unreasonable regardless of whether his Guidelines imprisonment range is 21 to 27 months or 30 to 37 months. For the same reasons, we conclude that Mulet's total sentence was substantively reasonable.

## III. CONCLUSION

The district court did not abuse its discretion by excluding Cabrera's testimony. The district court also did not abuse its discretion by denying Mulet's motion for a mistrial because his argument in support of his motion is foreclosed by binding caselaw. Finally, any error in assessing a three-level Guidelines enhancement does not warrant reversing Mulet's total sentence, and Mulet's total sentence was substantively reasonable.

**AFFIRMED.**